**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PETER MICHAEL KARENBAUER,   )
                            )
            Petitioner,     )   Civil Action No. 05-1586
                            )
        v.                  )   Judge Cercone
                            )   Magistrate Judge Bissoon
EDWARD KLEM, *et al.*,       )
                            )
            Respondents.    )

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I.   RECOMMENDATION

It is recommended that the Petition for Writ of Habeas Corpus filed by Peter Michael Karenbauer be dismissed and that a certificate of appealability be denied.

### II.   REPORT

Peter Michael Karenbauer ("Karenbauer" or "Petitioner"), a state prisoner, has filed a federal habeas corpus petition challenging his conviction for Criminal Homicide in the Court of Common Pleas of Lawrence County, Pennsylvania.  Karenbauer stands convicted of the brutal murder of eight-year-old Lacy Johnson, the daughter of Karenbauer's girlfriend, Nita Johnson.  The victim suffered multiple stab wounds.  Karenbauer was arrested shortly after the murder, and he gave two statements to police detailing how he had killed Lacy.

Karenbauer presented a diminished capacity defense at trial, arguing that he lacked the specific intent to kill required under Pennsylvania law for a conviction of first degree murder.  The

jury found Karenbauer guilty of first degree murder on July 31, 1996, and sentenced him to death. Karenbauer's death sentence was overturned during his collateral appeal, and he presently is serving a life sentence.

The main thrust of the instant counseled petition for writ of habeas corpus is that trial counsel failed to investigate the circumstances of the killing. More specifically, Karenbauer argues that there were indications that his repeated confessions were inaccurate in some respects, and that the victim's mother, Nita Johnson, may have been involved in the killing. He argues that trial counsel's failure to investigate and present a defense based upon the assumption that his confessions were "false," and that Nita Johnson had some involvement in the killing, constitutes ineffective assistance of counsel.

## A. **Facts of the crime**.

A detailed recitation of the underlying facts is necessary to understanding the claims in this matter. The following is a lengthy excerpt from the opinion of the Supreme Court of Pennsylvania's opinion affirming the judgment of sentence, which provides a helpful summary of the testimony at trial:

> The record reveals that on July 16, 1995, Karenbauer, accompanied by Lacey, drove Nita Johnson, Lacey's mother, to her place of employment and then returned home. When Karenbauer arrived to pick up Nita at the end of her shift, he told her that Lacey was staying with her maternal grandparents and that he would take her (Nita) out for the evening. Karenbauer and

2

Nita spent the night in a motel.

Returning to their home the next morning, both Karenbauer and Nita fell asleep in the downstairs living room. Nita's son, Michael Johnson, arrived around noon and told his mother that her parents, with whom he often stayed, were outside in their van. At that point, Karenbauer told Nita that in fact Lacey was not with her grandparents but rather that he had allowed her to leave with her father, Nita's husband. Fearing that her husband had kidnapped Lacey, Nita went outside to talk to with her parents. When she returned to the house, Karenbauer was no longer there. Nita and her son went upstairs. As Nita was looking out a bedroom window, trying to spot Karenbauer, Michael said that there were blankets under the bed. The "blankets" turned out to be Lacey's body, wrapped in a blanket and dressed in wet, blood-soaked clothing. A knife handle was found on top of the bed, and the knife blade, which had apparently been snapped off, was later found between the mattress and the box springs in the master bedroom. In addition, there were bloodstains on the floor and walls of the room in which Lacey's body was found, as well as in the bathtub.

Following the discovery of the body, police officers searched for Karenbauer. New Castle Police Chief Charles Abraham testified that as he and Lieutenant Gagliardo were driving through the neighborhood, they spotted a man who fit Karenbauer's description, and Chief Abraham asked, "Are you Mike?" Karenbauer answered, "Yes, I know, I murdered somebody." Karenbauer then got into the patrol car and was read his *Miranda* rights. When asked whether he wanted to tell what had happened, Karenbauer replied that Lacey "got mouthy" and that he stabbed her "a lot" of times and then held her underwater.

At the police station, Detective Sergeant Thomas Sansone gave Karenbauer a second Miranda warning. Karenbauer then made a statement, which was reduced to writing and signed, and which read in pertinent part as follows:

Me and Lacy went swimming in our pool in the backyard. Me and Lacy got into an argument in the swimming pool. We went into the house and were still arguing. We went upstairs to change clothes. The next thing I remember was that I was holding Lacy under water in the bathtub. I saw blood covering Lacy and the water was bloody also. I wiped the blood off of my arms with a towel. I don't remember stabbing Lacy but I saw her bleeding from her chest area while I had her in the tub. I left Lacy in the tub and I got changed, and left the house....

Early the next morning, July 17, 1995, [Nita and I] left the motel and went home to Morris Street. I went upstairs to the bathroom and I saw Lacy still lying in the tub. The water was out of the tub and there was blood all over. I got a blanket from Mike's room and put the blanket on the floor and took Lacy from the tub and put her in the blanket. When I picked Lacy up, blood ran all over the floor. I took Lacy into Mike's room and put her under the bed. I went back to the bathroom and cleaned the blood up. I took the towels and rags and put them under Mike's bed. I found a knife blade in a pool of blood in Mike's room. I picked the blade up and covered the pool of blood with a basket. I took the knife blade to my bedroom and put it under my mattress.... I then took a shower to get the blood off of me.

Karenbauer's confession was read into evidence at trial; Karenbauer did not testify during the guilt phase of the proceeding.

A Commonwealth witness, Detective Sergeant Cynthia Eve of the New Castle Police, testified that during a recess in a pre-trial proceeding she heard Karenbauer, who was in a private room about 15 feet from her, shouting "I did it, I don't know why I did it, nobody can tell me why I did it.... They should just shoot me." She described Karenbauer as crying and upset.

According to Dr. James Smith, the pathologist who conducted the autopsy, Lacy sustained 18 knife

wounds, some of which were defensive in nature, and none of which was fatal by itself. The cause of death, in Dr. Smith's opinion, was the combination of hemorrhage from the multiple knife wounds, partial asphyxia caused by the collapse of the right lung as the result of a stab wound, and asphyxia caused by drowning. Forensic testimony established that the blood on the knife blade found in the master bedroom carried a genetic marker that was consistent with Lacy's blood.

Karenbauer did not deny that he killed Lacy. Instead, he presented a diminished capacity defense, asserting that he could not be guilty of murder in the first degree because he had been unable to form a specific intent to kill.

To support his claim, Karenbauer offered the testimony of Dr. Lawson Bernstein, a forensic neuropsychiatrist. Dr. Bernstein opined that Karenbauer suffered from moderate mental retardation, a history of injury to the frontal lobes of the brain, and severe depression, all of which combined to diminish severely his capacity to premeditate, deliberate, and form a specific criminal intent.

Dr. Bernstein's opinion was challenged by the Commonwealth's expert, Dr. Christine Martone, a staff psychiatrist at the State Correctional Institution at Pittsburgh and a specialist in the treatment of mentally ill offenders. In her opinion, Karenbauer's mental retardation was mild rather than moderate, his diagnosis was that of borderline personality disorder, and, at the time in question, he was able to form a specific intent to kill.

Commonwealth v. Karenbauer, 715 A.2d at 1089-1091.

B. **Direct appeal**.

Karenbauer raised several claims on direct appeal which are now being asserted here. He challenged: (1) the sufficiency of the evidence to support the finding of a specific intent to kill

necessary to a first degree murder conviction in Pennsylvania;
(2) the trial court's denial of Karenbauer's motion to change
venue or venire due to pre-trial publicity; (3) the trial court's
denial of trial counsel's motion to withdraw; (4) the trial
court's ruling that Karenbauer was not permitted to ask potential
jurors if they belonged to any victim's rights groups; (5) the
admission of a custody order barring Karenbauer from having
contact with the victim; (6) the trial court's ruling permitting
an expert witness to testify that none of the victim's stab
wounds would have rendered her unconscious prior to her drowning;
(7) the trial court's instruction to the jury that it could
consider the defense case in making its determination of intent
to kill.  Karenbauer made other claims concerning the penalty
phase of trial which are not relevant to this petition.

The Supreme Court of Pennsylvania affirmed Karenbauer's
conviction on direct appeal, and certiorari was denied by the
United States Supreme Court on March 22, 1999.

## C. **State collateral appeal.**

Karenbauer filed a petition pursuant to the Post Conviction
Relief Act (PCRA), 42 Pa.C.S.A. §9541, *et. seq.*, on May 10, 1999.
Counsel was appointed, and an amended petition was filed in which
Karenbauer argued that trial counsel was ineffective for failing
to investigate his case, and in choosing to present a diminished
capacity defense at trial rather than a defense challenging the

6

accuracy of Karenbauer's confessions and seeking an acquittal of the charges.  It was in this proceeding that Karenbauer first asserted that trial counsel should have pursued some defense other than diminished capacity.

While the PCRA petition was pending, the Supreme Court of the United States decided <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002)(execution of mentally retarded criminals violates the Eighth Amendment).  Karenbauer had been found at trial to suffer from at least mild mental retardation, hence his death sentence was overturned, and a sentence of life imprisonment imposed, thereby mooting any claims addressed to the penalty phase of Karenbauer's trial.

The PCRA court, addressing only guilt phase issues, dismissed Karenbauer's petition without a hearing on April 1, 2003, and filed a lengthy opinion in support of its decision. The Superior Court of Pennsylvania affirmed the order denying PCRA relief on September 29, 2004, and the Supreme Court of Pennsylvania denied Karenbauer's petition for allowance of appeal on May 3, 2005.

D.    **The instant petition**.

The instant petition was filed on November 15, 2005, by court-appointed counsel.  An amended petition was filed on February 8, 2007, and a corrected version of the amended petition was filed on March 15, 2007.  Respondents' amended answer was

filed on June 18, 2007.  Counsel for Karenbauer filed a traverse on August 17, 2007.  The petition is now ripe for disposition.

**E. Statute of limitations**.

Respondents argue that this petition was not timely filed and is barred by the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, 110 Stat. 1214, April 24, 1996, (AEDPA), codified at 28 U.S.C. §2244(d) ("AEDPA"'s) one-year statute of limitations.  Because this issue is potentially dispositiv, it will be addressed as a preliminary matter.

For habeas corpus petitions filed after April 24, 1996, challenging state sentences under 28 U.S.C. § 2254, AEDPA's one-year statute of limitations applies. To determine whether Karenbauer's petition was timely filed, the court must first determine the date direct review concluded and the judgment became "final." See 28 U.S.C. § 2244(d)(1)(A). Second, the court must determine whether any "properly filed" applications for collateral relief tolled the limitations period. See 28 U.S.C. § 2244(d)(2). Finally, the court must determine whether another statutory exception or equitable tolling is applicable.

Karenbauer's direct appeal concluded on March 22, 1999, when the United States Supreme Court denied his petition for writ of certiorari. See Douglas v, Horn, 359 F.3d 257, 261 (3d Cir. 2004); Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000)(a judgment becomes final at the conclusion of direct review or the

expiration of time for seeking such review, including the 90-day time limit for filing a writ of *certiorari* in the Supreme Court). Thus, Karenbauer had until March 22, 2000, to filed a petition for writ of habeas corpus. His petition was not filed until November 15, 2005. Absent any tolling, the petition clearly would be untimely.

The parties agree that AEDPA's "tolling" provision, 28 U.S.C. § 2244(d)(2), applies in this case. They disagree on the length of such tolling.

On May 10, 1999, Karenbauer filed in the state court a "Motion for Post Conviction Collateral Relief" (Doc. 26, Ex. 5). Karenbauer did not set forth any specific claims therein, but checked several boxes on the pre-printed form indicating that various of his constitutional rights had been violated. He also asked that counsel be appointed to represent him. The state court appointed counsel, and ordered that an amended petition be filed. The amended PCRA petition was filed on September 8, 1999.

Respondents' position is that tolling should begin with the filing of the amended PCRA petition on September 8, 1999, not May 8, 1999. They maintain that the May 10, 1999 document that the state court treated as a petition for relief was, in effect, nothing more than a motion for appointment of counsel. Such motions, Respondents suggest, do not qualify as "properly filed" applications for state court collateral relief for purposes of

AEDPA's tolling provision.  If Respondents are correct, and tolling only begins on September 8, 1999, then the instant petition is untimely by one day[1].

Respondents rely upon <u>Beery v. Ault</u>, 312 F.3d 948 (8th Cir. 2002), in which a state prisoner's "motion for appointment of counsel" was considered insufficient to constitute a "properly filed" collateral appeal under Iowa law for purposes of tolling AEDPA's limitations period.  The Eighth Circuit's analysis of the issue centered upon the applicable provisions of Iowa law, and the manner in which Iowa courts treat such motions.  "Iowa courts have not held postconviction proceedings begin with a motion for appointment of counsel. On the contrary, Iowa courts look to the date the inmate filed the application rather than the date the inmate sought appointment of counsel." <u>Id</u>., at 951.  The Eighth Circuit noted that the motion filed in <u>Beery</u> contained no allegations of fact, and otherwise did not appear to be a petition for relief.

Here, by contrast, the document filed by Karenbauer was not

_____

1    Under Respondents' view of the law, the clock would run from March 22, 1999, through September 8, 1999 -- a period of 170 days.  The limitations period would again begin to run on May 3, 2005, and would continue running until the instant petition was filed on November 15, 2005, an additional period of 196 days.  This would total 366 days of elapsed time for purposes of AEDPA's one-year statute.  If, on the other hand, tolling begins on May 9, 1999, with the filing of the "Motion for Post Conviction Collateral Relief," the instant petition was filed within the statute of limitations period.

captioned a motion for appointment of counsel, it was, instead, captioned as a "Motion for Post Conviction Collateral Relief." Further, Karenbauer indicated in the motion, by checking boxes next to applicable claims, that he believed certain of his constitutional rights had been violated. Karenbauer thereby presented claims for review by the PCRA court.

Finally, and most importantly, the state PCRA court clearly treated the May 10, 1999 filing as a petition for collateral relief, appointed counsel, and directed that an amended petition be filed.[2]

Just as the Eighth Circuit in <u>Beery</u> found dispositive the manner in which Iowa courts treated filings made by petitioners, so too does it follow that the state PCRA court's determination here should be determinative. Thus, in this case, the court is satisfied that a "properly filed" state court collateral appeal was pending on Petitioner's behalf beginning on May 10, 1999, which tolled the running of the statute of limitations on that date, thereby making the instant petition timely. <u>Compare</u>, <u>Artuz v. Bennett</u>, 531 U.S. 4, 8 (2000)(a pleading is filed "when it is delivered to, and accepted by, the appropriate court officer for placement in the official record," and it is *properly* filed "when

---

2      Respondents' make much of the fact that counsel had already been appointed to represent Karenbauer in his penalty appeal prior to the time that the initial PCRA pleading was filed. This fact undercuts their argument that the document filed by Karenbauer merely sought the appointment of counsel.

its delivery and acceptance are in compliance with the applicable laws and rules governing filings.").

**F.    Exhaustion and procedural default**.

Before addressing the merits of Petitioner's claims, this court must first determine whether constitutional and federal law issues have fairly been presented to the state courts through direct appeal, collateral review, or other available procedures for judicial review. See, e.g., Castille v. Peoples, 489 U.S. 346, 351 (1989); Picard v. Connor, 404 U.S. 270, 275 (1971); Doctor v. Walters, 96 F.3d 675, 678 (3d Cir.1996); Burkett v. Love, 89 F.3d 135, 137 (3d Cir.1996). 28 U.S.C. § 2254(b) requires that a state prisoner exhaust all available state court remedies before seeking federal relief. This exhaustion requirement serves to protect the interest of comity, which ensures that the state courts have the first opportunity to address and correct violations of state prisoners' federal rights. Rose v. Lundy, 455 U.S. 509, 518 (1982); Preiser v. Rodriguez, 411 U.S. 475, 491 (1973). Generally, in order to satisfy the exhaustion requirement, "a state prisoner seeking federal habeas relief must present each of his claims to the state's highest court." Story v. Kindt, 26 F.3d 402, 405 (3d Cir.1994). Exhaustion is not a jurisdictional limitation, however, and federal courts may review the merits of a state prisoner's claims prior to exhaustion when no appropriate state

remedy exists. <u>Christy v. Horn</u>, 115 F.3d 201, 206 (3d Cir.1997).

The court has reviewed Karenbauer's claims and has determined that they have been presented either on direct appeal, or in his PCRA proceeding. Hence, available state court remedies have been exhausted. Likewise, the doctrine of procedural default does not appear to bar any of the claims presently raised by Karenbauer[3].

---

3    In addition, a federal court may be precluded from reviewing claims under the procedural default doctrine. <u>Gray v. Netherland</u>, 518 U.S. 152 (1996); <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991). Like the exhaustion requirement, the procedural default doctrine was developed to promote our dual judicial system; it is based upon the "independent and adequate state ground" doctrine, which dictates that federal courts will not review a state court decision involving a question of federal law if the state court decision is based on state law that is "independent" of the federal question and "adequate" to support the judgment. <u>Coleman</u>, 501 U.S. at 750.  Federal habeas review is not available to a petitioner whose constitutional claims have not been addressed on the merits due to procedural default unless a petitioner can demonstrate: 1) cause for the default and actual prejudice as a result of the alleged violation of federal law; or 2) that failure to consider the claims will result in a fundamental miscarriage of justice. <u>Id</u>.  Respondents argue that Karenbauer's <u>Brady</u> claim (see Section IV, <u>infra</u>) is subject to a state court procedural default barring review. The state PCRA court rejected Karenbauer's <u>Brady</u> claim on the merits, but on appeal the Superior Court of Pennsylvania found the claim waived as it was not raised on direct appeal.  Assuming that the claim was waived, the analysis set forth below establishing that the PCRA courts' ruling on the merits is not inconsistent with federal law would also suffice to establish that Karenbauer cannot meet the prejudice prong of <u>Coleman</u>.  Thus, the claim is either barred from review or, in the alternative, lacks merit for the reasons set forth below.

## G.  **Applicable standard of review.**

A federal court may not issue a writ of habeas corpus unless it concludes that the state court's adjudication resulted in a decision that is "contrary to," or an "unreasonable application of," clearly established federal law as determined by the Supreme Court of the United States. 28 U.S.C. § 2254(d)(1). "Under §2254(d)(1)'s unreasonable application clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Williams v. Taylor, 529 U.S. 362, 411 (2000).

Further, a federal court must accord a presumption of correctness to a state court's factual findings, which a petitioner can rebut only by clear and convincing evidence pursuant to 28 U.S.C. § 2254(e).  A petitioner also may challenge the decision of the state court on the basis that it is an unreasonable determination of facts as contemplated under 28 U.S.C. §2254(d)(2).

With respect to 28 U.S.C. § 2254(d)(2), which dictates that federal habeas relief may be granted when the state court adjudication was based on an unreasonable determination of the facts in light of the evidence presented, the petitioner must demonstrate that a reasonable fact-finder could not have reached

the same conclusions given the evidence.  If a reasonable basis existed for the factual findings reached in the state court, then habeas relief is not warranted. <u>Campbell v. Vaughn</u>, 209 F.3d 280, 290-91 (3d Cir.2000), <u>cert</u>. <u>denied</u>, 531 U.S. 1084, 121 S.Ct. 789, 148 L.Ed.2d 685 (2001).  Furthermore, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

**H.    <u>Merits of the instant petition</u>**.

The claims made by Karenbauer will be addressed seriatim.

**I.    Trial counsel rendered constitutionally ineffective assistance in several respects:**

**A. Trial counsel was ineffective for failing to present and use the testimony of defense expert, Dr. William A. Cox, which directly refuted the Commonwealth's theory that Lacy died as a result of drowning;**

**B. Trial counsel was ineffective in not challenging the Commonwealth's reliance on Karenbauer's false confession that Lacy was killed on Sunday evening, and that her wounds were inflicted by a thin, serrated blade knife;**

**C. Trial counsel was ineffective in failing to investigate or question the other obvious inconsistencies of Karenbauer's false confession;**

**D. Trial counsel was ineffective for failing to investigate Nita Johnson's involvement in the murder of her daughter, Lacy Johnson;**

**E. Trial counsel was ineffective for failing to determine if Karenbauer was competent to stand trial; and**

**F. Petitioner was prejuced.**

These claims were presented to the state courts in Karenbauer's counseled PCRA petition. The state court dealt with the issues in combination as a challenge to trial counsel's decision to proceed with a defense of diminished capacity as opposed to pleading not guilty. Since the focus of habeas review is the extent to which a state court's decision comports with federal constitutional and statutory law, the court will consider Petitioner's claims in the same grouping as did the state court.

The Sixth Amendment's right to counsel exists "in order to protect the fundamental right to a fair trial." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993) (quoting Strickland v. Washington, 466 U.S. 668, 684 (1984)). The Supreme Court has formulated a two-part test for determining whether counsel rendered constitutionally ineffective assistance: 1) counsel's performance was unreasonable; and 2) counsel's unreasonable performance actually prejudiced the defense. Strickland, 466 U.S. at 687. To determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to judge counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct. Strickland, 466 U.S. at 690.

The first prong of the <u>Strickland</u> test requires a defendant to establish that his or her attorney's representation fell below an objective standard of reasonableness by committing errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 688. A court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the totality of the circumstances, the challenged action "might be considered sound trial strategy." <u>Id</u>. at 689. The question is not whether the defense was free from errors of judgement, but whether counsel exercised the customary skill and knowledge that normally prevailed at the time and place. <u>Id</u>.

The second prong requires a defendant to demonstrate that counsel's errors deprived him or her of a fair trial and the result was unfair or unreliable. <u>Strickland</u>, 466 U.S. at 689. To prove prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694 (emphasis added). A "reasonable probability" is one that is sufficient to undermine confidence in the outcome. <u>Id</u>.

Further, and of particular relevance in light of Karenbauer's claim that counsel failed to present a specific

defense in this case, federal law recognizes that trial counsel need not present every possible defense in every case. Indeed, one of counsel's greatest responsibilities at trial is to choose from among possible defenses the defense or defenses most likely to benefit his client. See, e.g., Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 563, 160 L.Ed.2d 565 (2004) (it is reasonable for defense counsel enter guilty plea in capital case to concentrate on penalty phase, thereby avoiding counterproductive course which might result from presenting inconsistent defenses); Jacobs v. Horn, 395 F.3d 92, 107-08 (3rd Cir.2005) (counsel's failure to assert a diminished capacity defense was not unreasonable where such a defense would have undermined counsel's strategy to seek acquittal based upon Petitioner's innocence); Porter v. Horn, 276 F.Supp.2d 278, 315-16 (E.D.Pa.2003) (same). "The right to counsel does not require that a criminal defense attorney leave no stone unturned and no witness unpursued." Berryman v. Morton 100 F.3d 1089, 1101 (3d Cir. 1996). Notwithstanding, defense counsel does have a duty to make reasonable investigations or make a reasonable decision that makes particular investigations unnecessary. Strickland, 466 U.S. at 691. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure

of deference to counsel's judgments." Id.[4]

Here, counsel for Karenbauer makes several closely related arguments asserting that counsel failed to investigate and present a defense other than diminished capacity.  Each of these arguments focuses on reasons for counsel to doubt the accuracy of Karenbauer's repeated confessions to the killing.

First, it is asserted that the report of Dr. Cox, received by trial counsel months before trial, should have informed counsel that the victim died of a stab wound alone, and not from drowning, even though Karenbauer asserted he first stabbed the victim, and then held her under water.  Indeed, Dr. Cox indicates that he found no evidence that "the deceased's death was in part due to asphyxia due to drowning . . .." (Doc. 17, Ex. 2, p. 2).  While this certainly challenges the Commonwealth's version of events in that the Commonwealth presented evidence that the victim's death was the result, at least in part, of drowning, it does not necessarily indicate that anything was "false" in Karenbauer's confession.  Dr. Cox stated only that he did not believe the victim **died** from drowning; he did not find that Karenbauer did not attempt to drown her.

Next, on the basis of an affidavit from a Dr. John Smialek

---

4    The Pennsylvania standard applied by the PCRA court is not itself contrary to or an unreasonable application of Strickland. See, Werts v. Vaughn, 228 F.3d 178, 204 (3d Cir.2000).

prepared long after the trial, it is asserted that counsel should have "challenged the Commonwealth's reliance on Mr. Karenbauer's false confession" both due to the timing of the death, and the type of knife that was used in the killing. Dr. Smialek, on the basis of a review of the testimony and various photographs, stated that he believed the death occurred on July 17, 1995, and not on July 16, 1995, as Karenbauer stated in his confessions. He also believed that drowning did not cause the death, and that the knife wounds were not inflicted with the weapon found at the scene. Of course, this testimony is at odds with the testimony at trial from the forensic pathologist who conducted the autopsy and, as noted above, was not available to counsel at the time of trial.

Next, Dr. Lawson Bernstein, who testified at trial to Mr. Karenbauer's diminished capacity, has provided an affidavit in which he states that, had he been given Dr. Cox's report, he would have told trial counsel "that Mr. Karenbauer had provided inaccurate facts in his confession, and . . . would have questioned the confession in its entirety." (Doc. 17, Ex. 10).

Dr. Bernstein also commented upon the potential involvement of Nita Johnson, which is another part of the factual underpinning of Mr. Karenbauer's claim of ineffective assistance of counsel. Dr. Bernstein stated that Karenbauer's penalty phase testimony showed that he had "an odd dependency" on Ms. Johnson.

Another defense expert who has provided an affidavit is Dr. Scott, who examined Karenbauer at the time of trial and determined him competent to assist in his defense at trial. Dr. Scott has now been made aware of the statements of Wayne Brabson, who spoke with Mr. Karenbauer while both were in the Lawrence County Jail. Mr. Brabson reported to two separate Jail employees that Karenbauer confessed the murder, and further stated that it had been planned with Nita Johnson "for insurance money." (Doc. 17, p. 58). Karenbauer reportedly told Brabson that Johnson had talked Karenbauer into killing the victim, so that they both could collect on insurance policy. Id., at 59. On the basis of this, and other evidence of Nita Johnson's "influence" over Karenbauer, Dr. Scott concluded "it is my opinion that it is consistent with Mr. Karenbauer's impairments that he was most likely led into participating in this crime by another person. It is **remotely possible** that perhaps he did not even carry out the act, but still took responsibility." Id.(Emphasis added). Again, these opinions were offered long after the trial occurred, and, in any event, speak only of a likelihood that someone led Karenbauer to participate in the crime, and speaks of Karenbauer not being involved in the crime at all only as "remotely possible."

The thrust of the ineffective assistance argument, therefore, is that the evidence available to counsel, including

the asserted conflict between the forensic evidence and
Karenbauer's confessions, as well as Mr. Brabson's statements,
and Nita Johnson's influence over Karenbauer, along with
Karenbauer's mental condition, should have prompted counsel to
pursue a defense other than diminished capacity.  In this
respect, the court discerns two possible defenses that counsel
could have pursued.  The first is a defense that Karenbauer, in
fact, did participate in the murder, but did so at Johnson's
urging.  The second is that, even though he confessed repeatedly
and repeated his story consistently during the penalty phase,
that he, in fact, did not participate in the killing at all.
(Again, a likelihood that a defense expert, long after trial,
classifies as only a remote possibility.)

The applicability of the defense of diminished capacity is a
matter of Pennsylvania criminal law and was explained by the
Supreme Court of Pennsylvania as follows:

> We have held that "[a] defense of diminished
> capacity is only available to a defendant who
> admits criminal liability but contests the degree
> of guilt." Commonwealth v. Laird, 555 Pa. 629, 726
> A.2d 346, 353 (1999) (citing Commonwealth v.
> Weaver, 500 Pa. 439, 457 A.2d 505 (1983)).

Commonwealth v. Johnson, 815 A.2d 563, 578 (Pa. 2002).  Thus, as
a matter of Pennsylvania law, Karenbauer could not both present a
diminished capacity defense, and also assert that he took no part
in killing the victim.  As the PCRA court noted, the choice made
by counsel in this case to assert diminished capacity would have

22

prohibited his simultaneous pursuit of an assertion of Karenbauer's innocence of the crime.

Further, as the PCRA court noted, counsel had a client whose "position that he was responsible for the death was unwavering, from the time of his arrest, immediately after the discovery of the body of the victim, and through the time of his testimony at the penalty phase of the trial proceedings." (Doc. 26, Ex. 8 at 58). This is important because the decision to pursue a particular defense is, of course, for the defendant to make. The PCRA court determined it would have been beyond counsel's prerogative to insist on a defense inconsistent with his client's wishes. In this respect, the Pennsylvania Supreme Court has, in a converse context, made this precise ruling:

> In <u>Weaver</u>, counsel for Weaver had presented, without the consent of Weaver, a diminished capacity defense, even though Weaver insisted that someone else had committed the murder for which he was on trial. A jury convicted Weaver of first-degree murder and related crimes and the Court of Common Pleas of Tioga County sentenced Weaver to life imprisonment. Weaver filed a direct appeal to this Court. [footnote omitted] We determined that counsel for Weaver presented the only viable defense but, nonetheless, we vacated the Judgment of Sentence imposed by the Court of Common Pleas of Tioga County, finding that the authority to present a defense of diminished capacity, thereby conceding general criminal liability, is solely within the province of the accused. <u>Weaver</u>, 457 A.2d at 506.

<u>Commonwealth v. Johnson</u>, 815 A.2d at 578.

The PCRA court also noted that trial counsel had Dr. Scott's

report that Karenbauer was competent to stand trial. Dr. Scott also was of the opinion at the time of trial that Karenbauer knew "exactly what had happened and that it was to his advantage not to present the details." (Doc. 26, Ex. 8 at 56). The PCRA court, therefore, found that there was no merit to the claim that counsel could have pursued a claim of complete innocence in light of Karenbauer's continued insistence that he committed the murder,[5] and the lack of evidentiary support for such a defense.

The PCRA court also addressed the soundness of counsel's trial strategy, i.e., whether counsel's chosen course was reasonable. In this respect, the court noted that "much of the information that implicates the victim's mother does not absolve Karenbauer of having committed the killing." (Doc. 26, Ex. 8 at 59). Mr. Brabson's statements would have been useless to Karenbauer in this respect, since those statements, if believed, also would establish Karenbauer's knowing participation in a planned murder. And, to the extent that counsel may have been able to argue that Karenbauer's confessions were inaccurate as to time of death, and that the knife found may not have been the murder weapon, "this argument completely overlooks the fact that Karenbauer was also present at the house during the time period

---

5    Karenbauer's insistence that he killed Lacy apparently
     continues to the present day, as there is no affidavit from
     Karenbauer himself gainsaying his repeated confessions or
     offering any support for a claim that he is not guilty.

that the victim was killed, even under [the] present analysis of when the victim was killed. The existence of the wounds and manner of death were consistent and not contradicted by Karenbauer's statement." (Doc. 26, Ex. 8 at 59-60).

Finally, the PCRA court noted that evidence of Nita Johnson's involvement in inducing Karenbauer to kill her daughter "would only serve to bolster the Commonwealth's position that Karenbauer had a specific intent to kill." (Doc. 26, Ex. 8 at 60). The PCRA court concluded that counsel had a reasonable basis for pursuing the course he did, even in light of the evidence that the confessions contained some possible inaccuracies, and even in light of Johnson's possible involvement.

This court can find no fault with the PCRA court's analysis of this issue. An attempt to disprove Karenbauer's involvement in the killing based upon minor discrepancies between his confessions and the medical evidence now presented would have been fraught with peril. In fact, it would have stood in stark contrast to Karenbauer's repeated confessions. A jury would have been asked to believe that Karenbauer made up the confessions, and then repeated them in a consistent manner, a version of events that Dr. Scott, in an affidavit provided at Karenbauer's request, finds to be only remotely possible. On this, the PCRA court ruled that there was no "merit" to the underlying defense,

i.e., a ruling under the first prong of the <u>Strickland</u> standard, equivalent to a finding that a presentation of the defense would not have created a "reasonable probability" of a different outcome at trial. <u>Strickland</u>, <u>supra</u>. In other words, a defense based entirely on a "remote possibility" that someone who repeatedly confessed to a crime was, in fact, not involved, certainly cannot be said to provide a reasonable probability of a different outcome at trial.

Further, the only compelling evidence that Nita Johnson was involved in the killing is Mr. Brabson's recounting of Karenbauer's statements that Johnson planned the killing for insurance money, and convinced Karenbauer to kill the victim. This statement, if believed by a jury, is the equivalent of a guilty plea **by Karenbauer** to first degree murder. By presenting the diminished capacity defense, counsel has a chance to convince a jury that his client, who has confessed repeatedly and is admittedly guilty, is guilty of a lesser offense. Presenting a defense premised upon Karenbauer being talked into killing the victim presents no such possibility. Counsel's choice at trial to present a diminished capacity defense certainly stood a greater chance of success than presenting the jury with evidence that would have cemented the Commonwealth's case on specific intent. Thus, the trial court's alternate ruling that counsel's choice at trial was a reasonable one, and was a matter of sound

trial strategy, is also consistent with applicable federal law. Strickland, 466 U.S. at 689 (strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance can only be overcome by evidence that cannot "be considered sound trial strategy").

Therefore, the PCRA court's conclusions that the underlying defense had no merit, and that counsel had a reasonable basis for choosing the trial strategy that he did, are both conclusions that are neither contrary to nor an unreasonable interpretation of the Strickland standard. As such, Karenbauer's claims that counsel rendered ineffective assistance at trial do not warrant habeas relief.

**II. Karenbauer is entitled to relief from his conviction and sentence because he was tried while incompetent to proceed in violation of due process and because the trial court violated his rights under the fifth, sixth, and eighth amendments to the constitution when it failed to conduct a hearing to determine whether Karenbauer was competent, specifically:**

**A. The trial court failed to hold a competency hearing despite indicia that petitioner was incompetent.**

**b. All trial counsel were ineffective.**

Under federal law, the standard for competence to stand trial is whether the defendant had "a rational as well as factual understanding of the proceedings against him" and whether he had a sufficient "ability to consult with his lawyer with a

27

reasonable degree of rational understanding." Dusky v. United States, 362 U.S. 402, 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960). This two-part test, known as the "understand and assist test," primarily focuses on defendant's "memory and intellectual abilities, which are crucial to the construction and presentation of his defense." Hansford v. United States, 365 F.2d 920, 922 (D.C.Cir.1966). The standard applied by Pennsylvania courts is similar. Commonwealth v. Martinez, 446 A.2d 899 (Pa. 1982) (defendant must be able to understand nature and objective of proceedings and be able to cooperate in the presentation of his defense.). Indeed, the PCRA court relied upon federal precedent in making its ruling on this issue. (Doc. 26, Ex. 8, p. 66).

The conviction of a defendant who is legally incompetent violates a defendant's right to due process of law. See Pate v. Robinson, 383 U.S. 375, 378 (1966). A court's failure to make a proper competency inquiry, where there is substantial evidence of a defendant's incompetency, violates due process by depriving the defendant of his right to a fair trial. Robinson, 383 U.S. at 385-86; see also Drope v. Missouri, 420 U.S. 162, 172 (1975) (explaining that Robinson held "that the failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial"). Although the Supreme Court has never "prescribe[d] a general standard with respect to

28

the nature or quantum of evidence necessary to require resort to an adequate procedure" for determining competency, the Court has explained that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but ... even one of these factors standing alone may, in some circumstances, be sufficient." Drope, 420 U.S. at 172.

Further, in terms of reviewing a state court determination in a habeas proceeding under §2254, a determination by a state trial court that there was no convincing evidence to suggest incompetency on part of defendant, as would render conviction of defendant violative of due process, is a factual finding entitled to a presumption of correctness. Torres v. Prunty, 223 F.3d 1103, 1105 (9th Cir. 2000); Mackey v. Dutton, 217 F.3d 399, 411-412 (6th Cir. 2000).

Karenbauer asserts that there were sufficient indicia of the possibility that he was incompetent to warrant a competency hearing and that, absent such a hearing, reversible error has occurred. In this respect, he cites to reports from experts at the time of trial that he suffered from "cognitive and psychiatric disorders including severe depression, mental retardation, post-traumatic stress disorder, frontal lobe damage and personality disorder." (Doc. 17, p. 51). Karenbauer also

notes that he attempted suicide immediately prior to trial, and that he became emotional when his mother was called to testify at trial.

The PCRA court reviewed the record, and made the following determination:

> Although Karenbauer cites expert testimony presented at trial indicating that Karenbauer suffers from various mental disorders, the report of Dr. Scott, the court-appointed psychologist, revealed that Karenbauer was competent to stand trial. Not one of the mental health experts who testified ever gave any indication that the Defendant was incompetent to stand trial.

(Doc. 26, Exhibit 8, p. 66). With respect to the suicide attempt, the PCRA court noted that counsel advised the court that Karenbauer understood what was happening, and that he could assist counsel in his defense, even when the trial court asked whether a competency issue was being raised (Id.). The PCRA court went on to find that there was "nothing in the record to indicate that Karenbauer's demeanor or actions during the trial should have created any indication to the Court that he was mentally incompetent . . .." (Id.). Finally, the PCRA court found that trial counsel's repeated assurances "that the Defendant understood the charges and was able to cooperate with counsel" was evidence from "the best person to evaluate . . . [Karenbauer's] understanding of the charges and his ability to cooperate . . .." (Id.).

As noted above, the PCRA court's factual finding that there

was no basis for doubting Karenbauer's competence to stand trial
is entitled to a presumption of correctness.  Torres, supra;
Mackey, supra.  A federal court must accord a presumption of
correctness to a state court's factual findings which a
petitioner can rebut only by clear and convincing evidence
pursuant to 28 U.S.C. § 2254(e).  The trial court had before it
an expert report finding Karenbauer competent, defense counsel's
repeated assurances that Karenbauer understood the proceedings
and was assisting in his defense, as well as Karenbauer's ability
to participate in the trial, including his testimony at the
penalty phase, to indicate his competence.  Karenbauer's counter-
argument, premised upon his suicide attempt, his emotional
outburst when his mother was about to testify, and his request to
speak to Nita Johnson prior to deciding whether to testify at the
penalty phase of his trial, are, indeed, relevant factors.
However, the PCRA court considered all of these matters, and its
conclusion that, all things considered, there was "no merit to
the contention that the trial court should have conducted a
competency hearing" is a finding that Karenbauer has failed to
disprove by clear and convincing evidence, and which is,
therefore, binding on this court.

Karenbauer also asserts that counsel rendered ineffective
assistance in failing to request a competency hearing.  Indeed,
the failure to seek a competency evaluation or hearing can, in

some instances, be considered ineffective assistance of counsel. Jermyn v. Horn, 266 F.3d 257, 300 (3d Cir.2000)(§ 2255 petition). In Jermyn, the Court stated that:

> an attorney would render ineffective assistance of
> counsel if he or she failed to inquire into
> defendant's competency and failed to request a
> competency hearing, despite indicia of
> incompetence that would provide reasonable counsel
> "reason to doubt" the defendant's ability to
> understand the proceedings, communicate with
> counsel, and assist in his own defense.

Id. In order to determine whether counsel's assistance was, in fact, ineffective, this court must first determine whether there was sufficient "indicia of incompetence" for a reasonable attorney to doubt Petitioner's "ability to understand the proceedings, communicate with counsel, and assist in his own defense." Id. Furthermore, in determining whether counsel was ineffective in not requesting a competency hearing, this court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Jermyn, 266 F.3d at 300. Finally, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 302. The burden is on the petitioner to show otherwise. Id.

Based on the record as set forth above with respect to the claim that the trial court should have held a competency hearing on its own motion, the court likewise cannot conclude that there was reason for counsel to doubt Karenbauer's competence to stand

32

trial. Accordingly, this court cannot conclude that Petitioner's attorneys' decision not to request a competency hearing was unreasonable, as required by the first prong of the Strickland test. Because a party seeking relief for ineffective assistance of counsel must satisfy each prong of the Strickland test, and Petitioner has not satisfied the first prong, his ineffective assistance of counsel claim necessarily fails.

**III. Karenbauer's conviction must be vacated because the Commonwealth manipulated evidence in this case, in violation of *Napue v. Illinois*, and his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

The Supreme Court long ago determined that matters that corrupt the truth-seeking process, such as knowing presentation of perjured testimony by the prosecution, would be grounds for a new trial. Napue v. Illinois, 360 U.S. 264 (1959)(co-conspirator responding falsely to defense questioning that no promises had been made to him by prosecution; prosecution fails to disclose agreement with witness); see also, Giglio v. United States, 405 U.S. 150 (1972)(same). Here, Mr. Karenbauer invokes a rather unique twist upon this precedent.

A fellow prisoner, Wayne Brabson, spoke with Mr. Karenbauer while both were in the Lawrence County Jail. Mr. Brabson reported to two separate Jail employees that Karenbauer confessed the murder, and further stated that it had been planned with Nita Johnson "for insurance money." (Doc. 17, p. 58). Karenbauer reportedly told Brabson that Johnson had talked Karenbauer into

33

killing the victim, so that they both could collect on insurance policy. Id., at 59. These statements were not presented at trial due to an agreement between the Commonwealth and defense counsel. Thus, as the PCRA court observed, the court did not suppress relevant evidence in this case. Indeed, the defense was provided "the entire content of Brabson's statements and, more importantly, such statements were not withheld by the Commonwealth nor was the evidence relative [to] the same manipulated." (Doc. 26, Ex. 8, p. 61). In fact, habeas counsel concedes that the reports containing Brabson's entire statement "were disclosed to trial counsel . . . .." (Doc. 17, p. 59, note 26). These facts undermine a Napue challenge.

An attempt to challenge a conviction under Napue in a case, such as this one, in which the Commonwealth has provided the evidence in question to the defense is untenable because there has been neither false testimony nor a withholding of evidence that would prevent the discovery of the false testimony. In fact, Petitioner's complaint is that the Brabson statement **should have been presented** so that Nita Johnson's potential involvement in this case could have been explored. This, though, has nothing any alleged manipulation of evidence by the Commonwealth to the detriment of the truth-finding process, but instead is a matter of defense counsel's choice in presenting a defense. Moreover, as the PCRA court noted, the statement by Brabson "was fully

inculpatory as to Karenbauer and added nothing more than a motive for Karenbauer to commit the killing." (Id., pp. 61-62). In fact, the decision by the Commonwealth not to present the Brabson statement actually was a victory for the defense. A statement establishing that Karenbauer had a motive for the killing, and had planned it out, would eviscerate his defense. Thus, far from being a case where the Commonwealth manipulated evidence to the detriment of a criminal defendant, the events leading to the Brabson statement being kept out of the trial were entirely beneficial to Mr. Karenbauer's defense. The state court's ruling on the Napue claim is not an unreasonable application of federal law.

**IV. Karenbauer's conviction must be vacated because the Commonwealth suppressed evidence in this case, in violation of *Brady v. Maryland*, and its progeny, and his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

Petitioner asserts that the Commonwealth should have disclosed to him the existence of a statement made by Nita Johnson to police on July 17, 1995, and two telephone calls placed to police that same date. Petitioner argues that the Commonwealth's failure to disclose the existence of these statements prior to trial is a violation of its duty to disclose exculpatory evidence pursuant to Brady v. Maryland, 373 U.S. 83

(1963)[6].

 Brady holds that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilty or punishment, irrespective of good faith or bad faith of the prosecution." Id. at 87.  Evidence is material for purposes of Brady where a reasonable probability exists that the outcome would have been different had the evidence been disclosed. Riley v. Taylor, 277 F.3d 261, 301 (3d Cir.2001) (en banc).

 First, it should be noted that the July 17, 1995 "statement" referred to by Karenbauer is, in fact, merely an indication that Nita Johnson was interviewed by police that day.  There is no indication in the record that any statement was made by Ms. Johnson at that time or that the police reduced any portion of the interview to writing.  Hence, it does not appear that anything was withheld from the defense in this respect.

 Likewise, the telephone calls at issue were made on July 17, 1995, at 6:55 p.m. and the second an unspecified amount of time later. (Doc. 17, p. 64).  These calls are alleged to have been "material" in that they could have been used to bolster an argument concerning "the Commonwealth's weak and poorly-investigated case." (Doc. 17, p. 65).  It should be noted that

---

6    One statement made by Johnson, from August 3, 1995, was
     provided to the defense.

36

the timing of the calls coincides with testimony at trial that police were first called when Ms. Johnson suspected that her husband had taken the victim, and that a second call was placed when her body was discovered. It does not appear that the fact that the calls occurred was withheld from the defense.

The state court denied Karenbauer's <u>Brady</u> claim on the basis that Karenbauer failed to establish materiality of either the July 17, 1995 statement, or the two telephone calls. Specifically, the PCRA court stated that Karenbauer failed "to identify the substance of the statement or how the disclosure of the information would have produced a different result." (Doc. 26, Ex. 8 p. 63). This analysis is fully consistent with federal precedent.

Karenbauer's argument that the calls or the statement by Johnson would have been exculpatory is unpersuasive. There is simply no evidence of record that the statement or the telephone calls contain anything remotely resembling exculpatory evidence. Hence, there has been no showing of materiality under <u>Brady</u>. <u>See</u>, <u>Riley</u>, 277 F.3d at 301 (materiality requires showing of a reasonable probability that the outcome would have been different had the evidence been disclosed).

**V. Karenbauer's conviction must be vacated because the trial court instructed the jury that it could rely on the defense in determining whether the Commonwealth had met its burden of proof; Karenbauers' convictions thus stand in violation of his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

As a general matter, states are free to set definitions of criminal offenses. Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997). "However, once the state has defined the elements of an offense, the federal Constitution imposes constraints upon the state's authority to convict a person of that offense." Id. In particular, the Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). Thus, a "jury instruction that omits or materially misdescribes an essential element of an offense as defined by state law relieves the state of its obligation to prove facts constituting every element of an offense beyond a reasonable doubt, thereby violating the defendant's federal due process rights." Smith, 120 F.3d at 415; see also Sandstrom v. Montana, 442 U.S. 510, 523, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979). In this respect, jury instructions only become constitutionally defective when there is a *reasonable likelihood* that the jury has applied the challenged instructions in a way that violates the Constitution." Smith, 120 F.3d at 411 (emphasis in original) (quoting Estelle v. McGuire, 502 U.S. 62,

72, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) and <u>Boyde v.</u>
<u>California</u>, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316
(1990)).

A court's analysis of challenged instructions "must focus
initially on the specific language challenged." <u>Smith</u>, 120 F.3d
at 411.  After that, the "allegedly constitutionally infirm
language must be considered in the context of the charge as a
whole." <u>Id</u>.

In this case, the challenged portion of the jury instruction
reads as follows:

> Now, even though the Commonwealth and the
> Commonwealth alone has the burden, obviously you
> will consider not only their evidence, but the
> evidence of the Defendant as well.

(Doc. 26, Exhibit 8 at 64).  The PCRA court concluded that
Karenbauer's argument lacked merit since "the Court at all times
placed the burden of proof on the Commonwealth and the
Commonwealth alone" and that an instruction to consider all of
the evidence presented does not "alter the burden of proof" at
trial (<u>Id</u>.).  Hence, the state court focused upon the impact of
the asserted erroneous instruction in light of the charge as a
whole, and determined that the jury was not misinformed
concerning the burden of proof.  The state court's analysis is
consistent with federal precedent.  There is no "reasonable
likelihood" that the jury believed that the defense bore the
burden of proof in this case. <u>Smith</u>, <u>supra</u>.

**VI. Karenbauer is innocent of first degree murder and the evidence is insufficient to support his conviction for first degree murder; his conviction therefore stands in violation of his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

Where a habeas petitioner challenges his incarceration on the ground that the evidence was insufficient to support a conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under this standard, "a federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. Accord Moore v. Deputy Commissioner(s) of SCI-Huntington, 946 F.2d 236, 243 (3d Cir. 1991), cert. denied, 503 U.S. 949 (1992). A federal court must apply this standard "'with explicit reference to the substantive elements of the criminal offense as defined by state law.'" Orban v. Vaughn, 123 F.3d 727, 731 (3d Cir. 1997)(quoting Jackson, 443 U.S. at 324 n.16). The finder of fact, however, weighs the evidence and the federal courts must defer to its resolution of conflicts in the evidence. Jackson, 443 U.S. at 326.

The test for sufficiency of evidence is the same under both Pennsylvania and federal law. See Evans v. Court of Common Pleas, Delaware County, 959 F.2d 1227, 1233 (3d Cir. 1992), cert. denied, 506 U.S. 1089 (1993). Under Pennsylvania law, an appellate court must determine whether the evidence, and all reasonable inferences deducible therefrom, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all of the elements of the offenses charged. Commonwealth v. Bricker, 525 Pa. 362, 581 A.2d 147 (1990). The Pennsylvania Supreme Court applied this standard in addressing Petitioner's challenge to the sufficiency of the evidence.

Specifically, Pennsylvania law requires a finding of a specific intent to kill to support a conviction of first degree murder. 715 A.2d at 1091. "The specific intent to kill can be inferred from the defendant's use of a deadly weapon upon a vital part of the victim's body." Id. In this case, the Supreme Court of Pennsylvania concluded that the victim's knife wounds, coupled with Karenbauer's confession to having administered those wounds, and to having held the victim under water after stabbing her, was sufficient under state law for the jury to infer specific intent to kill. This court agrees. The state court's ruling in this respect is not an unreasonable application of federal law and habeas relief is not appropriate.

**VII. Karenbauer's conviction and sentence must be vacated because the trial court improperly refused to allow a change of venue thereby depriving Karenbauer of his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

The issue of pretrial publicity and the effect it has upon a defendant's ability to obtain a fair trial was settled decasdes ago in Murphy v. Florida, 421 U.S. 794 (1974), Estes v. Texas, 381 U.S. 532 (1965) and Irvin v. Dodd, 366 U.S. 717 (1961):

> . . . [W]hen prejudicial pretrial publicity wholly undermines the impartiality of the jury, the trial court should take steps to assure a fair trial, usually by granting a change of venue. Sheppard [v. Maxwell], 384 U.S. [333] at 363, 86 S.Ct. 1507 [(1966)]; Rideau [v. Louisiana], 373 U.S. 723, 83 S.Ct. 1417 [(1963)].

> In some cases, adverse pretrial publicity is so extreme that the court will presume prejudice to the defendant. Irvin, 366 U.S. at 723, 81 S.Ct. 1639; Patton [v. Yount], 467 U.S. [1025] at 1031, 104 S.Ct. 2885 [(1984)]. "Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir.1992), overruled on other grounds Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); see also Sheppard, 384 U.S. at 333, 86 S.Ct. 1507; Rideau, 373 U.S. at 723, 83 S.Ct. 1417. Such cases, however, are "exceedingly rare." Rock, 959 F.2d at 1253; Flamer v. Delaware, 68 F.3d 736, 754 (3d Cir.1995). In fact, for a court to presume prejudice, "the community and media reaction ... must have been so hostile and so pervasive as to make it apparent that even the most careful voir dire process would be unable to assure an impartial jury." Rock, 959 F.2d at 1252.

> **In the absence of facts that demonstrate a
> presumption of prejudice, a defendant must prove
> actual prejudice, that is, that those who served
> on his jury could not reach an impartial verdict
> based solely on the evidence presented at trial.**
> <u>Patton</u>, 467 U.S. at 1035, 104 S.Ct. 2885 (citing
> <u>Irvin</u>, 366 U.S. at 723, 81 S.Ct. 1639); <u>Rock</u>, 959
> F.2d at 1253. . .. **To determine whether actual
> prejudice exists, the court should look to the
> totality of the circumstances, including the voir
> dire of the jury.** <u>Murphy</u>, 421 U.S. at 799-801, 95
> S.Ct. 2031.

<u>Pursell v. Horn</u>, 187 F.Supp.2d 260, 301 (W.D.Pa. 2002)(Smith,

D.J.)(emphasis added).

In this case, the Supreme Court of Pennsylvania first found

that Karenbauer failed to provide any support for his argument

that the pretrial publicity was so extensive as to permit him to

avoid having to prove actual prejudice.  Next, the Supreme Court

engaged in a detailed discussion of the evidence concerning

possible prejudice by analyzing the jury pool, and the answers

the prospective jurors gave to questions concerning pretrial

publicity.  The analysis concluded with a discussion of the 12

jurors actually selected:

> . . . four had heard nothing of the case prior to
> trial; two had known only that the crime involved
> was murder; one had heard of the case only through
> "small talk"; one had read only "basic
> information" about the case a year earlier; two
> had read the initial coverage of the case, as well
> as an article concerning jury selection that
> appeared in the New Castle News on the weekend
> prior to trial [in which the concluding paragraph
> mentioned Karenbauer's confessions]; one had read
> the jury selection article, as well as unspecified
> earlier coverage; and one had learned from the New

43

> Castle News, "not recently," that the central
> allegation in the case was that Karenbauer had
> murdered a little girl. None of the 12 claimed
> any substantial knowledge of the case and each
> affirmed that he or she had nor formed an opinion
> as to Karenbauer's guilt or innocence.

715 A.2d at 1093. The Supreme Court went on to hold that

Karenbauer failed to meet his burden of establishing actual

prejudice.

Here, as directed by relevant federal precedent, the state

court looked to the totality of the circumstances, including the

voir dire of the jury. Murphy, supra. A review of that evidence

does not reveal extensive pretrial publicity, nor anything

inflammatory. And, in any event, all of the seated jurors

indicated that they had not formed any opinion as to Karenbauer's

guilt or innocence. Therefore, the state court's ruling, which

tracked relevant federal precedent, is neither contrary to nor an

unreasonable application of federal law.

**VIII. Karenbauer's conviction and sentence must be vacated
because the trial court improperly prevented the defense
from asking potential jurors whether they belonged to any
victim's rights organizations thereby depriving Karenbauer
of his fifth, sixth and eighth amendments to the United
States Constitution.**

The same deficiency identified above applies to the claim

that the trial court did not allow inquiry concerning potential

jurors' membership in victims' rights organizations. As the

Pennsylvania Supreme Court held upon review of Mr. Karenbauer's

conviction, "[a]ll of the jurors swore that they were capable of

accepting and applying the law as instructed by the court, regardless of any preconceptions they may have had.  The Court was entitled to assume, absent some indication to the contrary, that the jurors would not violate their oath." <u>Karenbauer</u>, 715 A.2d at 1095.  In effect, the state court ruled that Karenbauer failed to establish any prejudice, i.e., he failed to establish that any seated juror harbored an bias against him.  As with the issue of pretrial publicity, the jurors' assurances that they would be able to impartially apply the law cannot lightly be set aside, and it is Karenbauer's burden to show "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." <u>Murphy</u>, 421 U.S. at 800. No such showing has been made here, and the state court's decision to deny this claim is not an unreasonable application of federal law.

**IX. Karenbauer's conviction must be vacated because trial counsel ineffectively failed to challenge his false confession and Karenbauer's conviction therefore violates his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

Defense counsel did seek to suppress the confessions made by Karenbauer.  While he did not challenge those confessions on the basis that they were "false," this claim is essentially a subtle variation on Karenbauer's challenge to his counsel's trial strategy.  As the PCRA court stated, the conclusion that counsel was not ineffective when he choose to present a diminished

capacity defense at trial disposes of this claim as well.

> **X. Karenbauer's conviction and sentence must be vacated because the trial court allowed the Commonwealth to improperly cross-examine Nita Johnson and the trial court's ruling deprived Karenbauer of his rights under the fifth, sixth and eighth amendments to the United States Constitution.**

At trial, the Commonwealth was permitted to cross-examine Nita Johnson about a custody order that barred Karenbauer from contact with the victim. Defense counsel's objection to this line of cross-examination was overruled. Petitioner asserts that he was denied a fair trial due to the admission of this evidence.

"A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" Baldwin v. Reese, 541 U.S. 27, 32, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004). When Petitioner presented his claim on direct appeal, he did not claim that the state's evidentiary rulings violated his constitutional due process and equal protection rights, as he must in order to assert a constitutional claim. Instead, he presented the claims solely as a matter of state evidentiary law, and that is how the Supreme Court of Pennsylvania analyzed it. Hence, the issue is not a proper subject for federal habeas review. See Johnson v. Rosemeyer, 117 F.3d 104, 109 (3d Cir. 1997); Geschwendt v. Ryan,

967 F.2d 877, 888-89 (3d Cir.1992). However, even if the issue had properly been framed as a constitutional one for purposes of state court review, the trial court's rulings clearly do not violate petitioner's rights.

There are times when evidence is so unfairly prejudicial that admission thereof can deny a criminal defendant a fair trial. Where the probative value of evidence, though relevant, is greatly outweighed by the prejudice to the accused from its admission, then use of such evidence may violate fundamental fairness and due process. Lesko v. Owens, 881 F.2d 44, 51-52 (3d Cir.1989). Here, the Supreme Court of Pennsylvania found that the admission of the custody order was not error, and that any possible prejudice was dispelled by the trial court's cautionary instructions to the jury concerning how they should view that evidence. 715 A.2d at 1095. Specifically, the state court found that the order was relevant cross-examination of Nita Johnson's testimony that she, Karenbauer and the victim "lived together" for two years prior to the killing and that the victim and Karenbauer got along well. 715 A.2d at 1095. In fact, Nita Johnson was forced to admit that the order was in effect for approximately two years, and that Karenbauer and the victim "basically did no more than cross paths as the one arrived at Nita's home and the other departed." Id., ftnt. 3. The trial court instructed the jury that the order was to be considered

"for the sole purpose of testing the veracity of Nita's assertion" that the three had been together for two or three years. Further, "[t]he court specifically instructed the jury not to speculate as to the reason why the order was entered and not to conclude that Karenbauer must have abused Lacy, there being no evidence of abuse." 715 A.2d at 1096. The state court found that "these instructions were more than sufficient to cure any prejudice to Karenbauer." Id.

The state court's determination that any prejudice to Karenbauer from the use of the custody order in cross-examining Nita Johnson was cured by the trial court's instructions is a decision which is neither contrary to nor an unreasonable application of federal law to the facts of this case.

**XI. Previous counsel was ineffective for failing to raise the issues presented in this petition at trial and in post-trial motions and for failing to properly litigate these issues on direct appeal to the Pennsylvania Supreme Court.**

This claim is actually an attempt to circumvent an argument by Respondents on procedural default or failure to exhaust. See, e.g., Edwards v. Carpenter, 529 U.S. 446 (2000)(Ineffective assistance of counsel on direct appeal is an independent constitutional claim and will not establish cause for procedural default of another claim unless the ineffective assistance of counsel claim was first raised in state court.); Line v. Larkins, 208 F.3d 153, 167 (3d Cir.2000). Because, however, the undersigned has not barred review of the merits of any

48

substantive claim on the basis of failure to exhaust or procedural default, there is no need to recast any of Petitioner's claims.  No claims have been found to be procedurally barred.

> **XII. Karenbauer is entitled to relief from his conviction and sentence because of the prejudicial effects of the cumulative errors in this case.**

"We recognize that errors that individually do not warrant habeas relief may do so when combined." Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007), citing Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir.2002).  Nevertheless, a federal habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice, i.e., unless he can show "a substantial and injurious effect or influence in determining the jury's verdict" from counsel's errors. Id. Where, as here, a court finds no errors on counsel's part, "the cumulative effect is the equivalent of adding multiple zeros." U.S. v. Winkelman, 548 F.Supp.2d 142, 151 (M.D.Pa. 2008).  For the reasons set forth above, there is no evidence that suggested to this court that the jury's verdict in this case is unreliable. As such, the claim that counsel made errors that cumulatively caused prejudice should be rejected. Albrecht, supra.

I.  **Certificate of Appealability**

"A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a

constitutional right." 28 U.S.C. §2253(c). Because Karenbauer has not made such a showing, a certificate of appealability should be denied.

In accordance with the Magistrates Act, 28 U.S.C. § 636(b)(1)(B) & (C) and Local Rule 72.1.4 B, objections to this report and recommendation shall be filed on or before October 20, 2008. Responses to objections are due on November 3, 2008. Failure to timely file objections may constitute a waiver of any appellate rights.


_____  s/Cathy Bissoon_____
                                 Cathy Bissoon
                                 United States Magistrate Judge


Dated: October 1, 2008